No. 2-09-0516    Filed: 7-9-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | |
|---|---|
| DON A. PEEPLES, JOSEPHINE M. PEEPLES, CHRISTOPHER L. MORRIS, COLETTE D. ZANKO, and RON W. ZANKO, | ) ) ) ) ) Appeal from the Circuit Court of McHenry County. |
| Plaintiffs-Appellees, | ) ) |
| v. | ) No. 07--CH--1421 ) |
| THE VILLAGE OF JOHNSBURG, DAVID G. DOMINGUEZ, President, HAROLD MAY, WILLIAM SANDELL, JOHN HUEMANN, ED HETTERMANN, BRUCE BENNETT, and MARY LOU HUTCHINSON, Trustees, | ) ) ) ) ) ) Honorable ) Maureen P. McIntyre, |
| Defendants-Appellants. | ) Judge, Presiding. |

JUSTICE SCHOSTOK delivered the opinion of the court:

This case involves an ordinance enacted by the defendants (collectively, the Village), establishing Special Service Area 23 in the Village of Johnsburg. After the Village proposed the special service area, the plaintiffs and other residents of the area (Objectors) filed an objection petition. The Village determined that the Objectors had not collected enough signatures to meet the statutory threshold to veto the special service area (see 35 ILCS 200/27--55 (West 2006)), and it adopted the ordinance at issue. The plaintiffs filed suit seeking a declaration that the ordinance was void and an injunction. Following a bench trial, the trial court found that the Objectors had collected

sufficient signatures to veto the Village's creation of Special Service Area 23. The Village appealed. We reverse.

In 2007, the Village identified a certain area that it wished to designate as Special Service Area 23, in order to create a wastewater treatment system and facility. The Village contended that waste leaching from septic fields in that area was contributing to the deterioration of the Fox River. On June 5, 2007, the Village approved an ordinance proposing the special service area. The project was to be financed with special tax bonds that would result in each resident of the special service area paying additional taxes each year for 20 years. On June 9, 2007, the Village published notice of the proposal and announced a public hearing to be held on June 25, 2007. The Village also mailed notices to taxpayers living within the proposed special service area.

The Village held public hearings on the proposal on June 25 and 27, 2007. On August 22, 2007, the Objectors submitted a petition containing the signatures of owners of record and electors in the special service area who opposed the proposal. Section 27--55 of the Property Tax Code (Code) (35 ILCS 200/27--55 (West 2006)) provides for the filing of such petitions, as follows:

> "§27--55. Objection petition. If a petition signed by at least 51% of the electors residing within the special service area and by at least 51% of the owners of record of the land included within the boundaries of the special service area is filed with the municipal clerk *** within 60 days following the final adjournment of the public hearing, objecting to the creation of the special service district, *** the district shall not be created ***."

Section 27--55 defines "electors" as all "resident[s] of the special service area registered to vote." 35 ILCS 200/27--55 (West 2006). "Owners of record" are defined as those persons "in whose name legal title to land included within the boundaries of the special service area is held according to the

records of the county in which the land is located." 35 ILCS 200/27--55 (West 2006). The relevant time for determining both of these qualifications is "the time of the public hearing held with regard to [the] special service area." 35 ILCS 200/27--55 (West 2006); see Village of Lake Barrington v. Hogan, 272 Ill. App. 3d 225, 233 (1995).

After receiving the petition, the village clerk reviewed the signatures to determine whether the statutory 51% thresholds were met. In addition, the clerk obtained from the McHenry County treasurer's office a list of the owners of record of the properties in the special service area, and from the McHenry County clerk's office a list of the registered voters in the special service area. After reviewing these and various other records, the village clerk determined that there were 1,240 owners of record and 1,014 electors within the special service area. The Objectors had submitted 736 signatures of alleged owners of record and 567 signatures of alleged electors. For various reasons, including death, duplication, error, and legal interpretations of the terms involved, the village clerk disqualified 174 signatures of owners of record and 78 signatures of electors, and she determined that the Objectors' petition contained valid signatures of 45% of the owners of record and 48% of the electors. The village clerk presented her figures to the village board in September 2007, approximately one month after the petition had been received. On September 17, 2007, the village board formally found that fewer than 51% of the electors and the owners of record had signed the petition and adopted an ordinance (Village of Johnsburg Ordinance No. 07--08--11 eff. (adopted September 17, 2007)) establishing the special service area.

Thereafter, the plaintiffs filed suit, seeking a declaration that Ordinance No. 07--08--11 was void pursuant to section 27--55, and an injunction preventing the Village from proceeding with the special service area plans. After a seven-day bench trial, the trial court found that there were only

1,210 owners of record within the special service area, that 51% of that number was 617, and that the Objectors had collected 619 valid signatures. As to electors, the trial court found that there were only 946 electors within the special service area, that 51% of that number was 483, and that the Objectors had collected 489 valid signatures. Thus, as the Objectors had collected more than the statutory threshold for both electors and owners, Ordinance No. 07--08--11 was void. The Village filed a timely notice of appeal.

Preliminary Issues

On appeal, the Village raises several arguments. In evaluating these arguments, we note that the plaintiffs did not retain counsel on appeal. Instead, they appeared pro se and filed five identical briefs containing argument and citations to the record on appeal, but no citations to legal authority. We take these briefs as we find them and do not make special allowances for the fact that the plaintiffs are pro se. "While reviewing courts are open to all persons who seek redress of their grievances, a party's decision to appear pro se does not relieve that party from adhering as nearly as possible to the requirements of the rules of practice enunciated by our supreme court." McCutcheon v. Chicago Principals Ass'n, 159 Ill. App. 3d 955, 960 (1987).

The first argument we address is the fundamental question of the proper scope of the trial conducted by the trial court. The trial court conducted a full bench trial on the issue of whether the Objectors' petition contained the signatures of at least 51% of the owners and electors. During the trial, the trial court permitted the Objectors to offer, and it later considered, evidence that had not been presented to the Village prior to its adoption of Ordinance No. 07--08--11, regarding whether certain signatures should be counted as those of electors or owners and whether the Village's calculation of the total numbers of electors and owners was correct. The Village argued strenuously,

both before the trial court and on appeal, that its actions in determining whether the 51% thresholds had been met and in enacting the ordinance were subject to review only under the Administrative Review Law (735 ILCS 5/3--101 et seq. (West 2006)). Under that type of review, the record is limited to those items that were actually before the Village at the time it made its decision and enacted the ordinance, no new evidence can be considered, and the court must take the Village's findings of fact to be prima facie true and correct. 735 ILCS 5/3--110 (West 2006). The complaint did not seek relief under the Administrative Review Law or its common-law counterpart, a petition for writ of certiorari.

The Administrative Review Law governs "every action to review judicially a final decision of any administrative agency" where the statute creating the agency expressly adopts either the Administrative Review Law or its predecessor, the Administrative Review Act (Ill. Rev. Stat. 1981, ch. 110, par. 262 et seq.). 735 ILCS 5/3--102 (West 2006). "Administrative agency" is defined to include not only administrative agencies of the State of Illinois but also political subdivisions of the state and municipalities that have the power to make administrative decisions. 735 ILCS 5/3--101 (West 2006). Where a local governmental entity acts in an administrative or quasi-judicial manner, such as by determining facts pursuant to a hearing or ruling on the rights of a small number of people, its actions may be appropriately reviewed using the procedures and principles of administrative review. City of Chicago Heights v. Living Word Outreach Full Gospel Church & Ministries, Inc., 196 Ill. 2d 1, 13-16 (2001).

There is little law on the issue of the type of review to be given to a municipality's decision to proceed with an ordinance establishing a special service area despite the filing of an objection petition. The counting of electors, owners of record, and signatures does not appear to us to be

inherently either a quasi-judicial or administrative task, or a legislative task. Although the Village cites case law stating that zoning decisions about special use permits are quasi-judicial or administrative in nature, it provides no legal support for the proposition that special service area decisions are the same. Our own investigation into the issue has uncovered no case law in which the validity of a special service area was challenged via administrative review procedures. By contrast, we have found cases in which plaintiffs sought declaratory judgments regarding the validity of special service area ordinances, in which there was no suggestion that declaratory judgment (and a full trial on the merits) was an improper vehicle for such a determination. See Village of Lake Barrington v. Hogan, 272 Ill. App. 3d 225, 228 (1995); Sweis v. City of Chicago, 142 Ill. App. 3d 643, 648 (1986); Ciacco v. City of Elgin, 85 Ill. App. 3d 507, 510 (1980).

The structure of the special service area statute supports the trial court's decision here to examine the sufficiency of the Objectors' signatures as an initial matter, without deferring to the Village's conclusions or limiting the evidence to be considered. The sections of the Code relating to special service areas do not provide for any particular procedure for review of a special service area proposal and objections thereto. See 35 ILCS 200/27--55 et seq. (West 2006). Indeed, the language of section 27--55 does not suggest any fact-finding role for the municipality at all: it simply states that, if an objection petition bearing the signatures of at least 51% of the electors and owners of record in the proposed special service area is filed with the municipality within the allotted time, the proposal is vetoed. Beghr Willowbrook Venture v. Village of Willowbrook, 217 Ill. App. 3d 614, 618 (1991) (section 27--55 "does not require an additional hearing by the Village after the petition has been filed to pass on the sufficiency of the petition"; rather, depending on whether the statutory requirements are met, the special service area proposal is either vetoed or not on the date that the

objection petition is timely filed). We find it significant that the Code does not require a municipality to hold any specific type of hearing or to "adjudicate" the question of whether objectors to a proposed special service area have gathered enough signatures. In keeping with the statute's structure, in this case the Village did not allow the Objectors to formally present evidence regarding their petition, nor was there any designated body (the counterpart to a zoning board of appeals, hearing referee, or administrative law judge) before which such a presentation could be made. The Objectors did informally provide members of the village board with a response to the Village's determination that they had not gathered enough signatures. However, one of the Objectors' complaints to the trial court was that they did not have a formal opportunity to present and argue the rationale behind their petition and response. The proceedings before the trial court were the first such opportunity they received. Accordingly, we do not think that the trial court erred in providing a full forum for the presentation of all admissible evidence either party wished to adduce, rather than applying the procedures of administrative review. We might perhaps reach a different conclusion if the Village had in fact attempted to resolve the issues raised by the Objectors in an administrative or quasi-judicial hearing with the opportunity to present testimony under oath, cross-examine witnesses, and present other admissible evidence. (Although, as we note, such a hearing was not required by the statute.) However, we need not conclusively decide the issue, as our ultimate decision in this case would be the same regardless of whether the trial court had applied administrative review procedures or, as it did, conducted a trial in the first instance. Living Word, 196 Ill. 2d at 16.

The Village raises a second issue regarding the trial court's conduct of the trial, complaining that the trial court first admitted, but then struck, two of its exhibits. Defendants' Exhibit 33 was a collection of deeds and other property records that the Village contended both supported its initial

determination that there were 1,240 owners of record within the special service area, and established that there were an additional 23 owners of record who had not been counted in the village clerk's initial determination. Defendants' Exhibit 34 was a summary of Exhibit 33. The village clerk testified that the exhibits contained updated and complete documentation relating to 833 parcels that she determined were within the special service area. The trial court asked her whether the exhibits contained any documentation relating to parcels that were not included in Defendants' Exhibit 23 (the list of owners as determined by her at the time she evaluated the Objectors' petition). The village clerk stated that she had not numbered the parcels in Exhibit 23 and therefore did not know whether there were any differences in the parcels included in each exhibit. On the penultimate day of trial, the Village moved to admit exhibits 33 and 34, and the plaintiffs stated that they would agree to the exhibits' admission subject only to possible objections if any of the specific deeds had not previously been produced to them, and they said that the parties could probably work out a stipulation of disputed and undisputed deeds. The trial court admitted the exhibits subject to any such specific objections. The next day, however, the plaintiffs raised an overall objection to the admission of the two exhibits on the basis of "irrelevancy," arguing that both they and the Village had relied on 1,240 as the total number of owners in evaluating the sufficiency of the Objectors' petition. The trial court agreed that the exhibits were irrelevant, because "it is beyond what the Village relied on and what anyone relied on." It also noted that the village clerk had been unable to tell it whether there were any new parcels identified in Exhibits 33 and 34 that had not been included in Exhibit 23. It then reversed its previous admission of the exhibits.

The determination of whether evidence is admissible is within the sound discretion of the trial court, and we will not reverse that determination unless there has been a clear abuse of that

discretion. People v. Sutton, 349 Ill. App. 3d 608, 615 (2004). A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court (People v. Anderson, 367 Ill. App. 3d 653, 664 (2006)), or where its ruling rests on an error of law (Cable America, Inc. v. Pace Electronics, Inc., 396 Ill. App. 3d 15, 24 (2009)). In this case, it is undisputed that the exhibits at issue were admissible in the sense that they were not hearsay and that a proper foundation had been laid for their admission. The trial court reversed its initial admission of the exhibits on the ground that they were "irrelevant" because they were not relied on by the Village before it adopted Ordinance No. 07--08--11. However, the trial court permitted the plaintiffs to offer a substantial amount of evidence that was not presented to the Village before it adopted Ordinance No. 07--08--11. The trial court did not err in admitting this evidence, because, as we concluded above, the trial court was not reviewing the Village's findings but, rather, was determining as an initial matter whether the Objectors' petition contained the signatures of 51% of the electors and owners of record in the special service area as of June 25, 2007, and the plaintiffs' new evidence was relevant to the determination of this issue. In re A.W., 231 Ill. 2d 241, 256 (2008) ("Evidence is relevant if it tends to prove a fact in controversy or render a matter in issue more or less probable"). By the same token, however, the Village's new evidence (specifically, Exhibits 33 and 34) was equally relevant to show the total number of owners of record of parcels within the special service area. The fact that evidence was not relied on by the Village in deciding to adopt Ordinance No. 07--08--11 cannot be used to bar the admission of the Village's evidence where that fact was not used to bar the admission of similar evidence proffered by the plaintiffs. We find that the trial court's decision to reverse the admission of Defendants' Exhibits 33

and 34 was arbitrary in light of its acceptance of similar evidence offered by the plaintiffs and was therefore an abuse of discretion.

Sufficiency of the Objectors' Petition

We turn to the question of whether the Objectors obtained enough signatures to veto the establishment of the special service area and render Ordinance No. 07--08--11 void. The Objectors bore the burden of proving that the ordinance was invalid. Sweis, 142 Ill. App. 3d at 648, citing Coryn v. City of Moline, 71 Ill. 2d 194, 199 (1978). The Objectors raised no issues regarding the notice provided to taxpayers, the constitutionality of the special service area statute, or any other general argument; rather, they argued solely that they had obtained more than 51% of the necessary signatures. The trial court's decision was limited to this issue as well. On appeal, we accept the trial court's findings of fact and will reverse them only if they are contrary to the manifest weight of the evidence; that is, unless "the opposite conclusion is clearly evident or the [factual] finding is arbitrary, unreasonable, or not based in evidence." Samour, Inc. v. Board of Election Commissioners, 224 Ill. 2d 530, 544 (2007). We review de novo issues that are purely legal. People v. Brown, 225 Ill. 2d 188, 198 (2007).

Electors

We begin by reviewing the trial court's conclusion that the Objectors' petition contained the signatures of at least 51% of the "electors residing within the special service area," that is, the "resident[s] of the special service area registered to vote." 35 ILCS 200/27--55 (West 2006). After receiving the petition, the village clerk obtained from the county clerk's office the list of registered voters and determined that a total of 1,014 registered voters resided within the special service area. At trial, the plaintiffs presented (1) affidavits in which the affiants stated that they had personal

knowledge that many of the persons listed as registered voters had moved from their listed addresses, and (2) the testimony of witnesses that, based on their personal knowledge, 62 persons had moved from the listed addresses. The trial court admitted this evidence (over the objections of the Village) and ultimately relied on it in finding that the total number of electors in the special service area should be reduced by 67, including the 62 persons who, according to the plaintiffs' witnesses, had moved. With the total number of electors thus reduced, the 489 signatures previously recognized as valid by the village clerk equaled more than 51% of the total electors.

In admitting and considering this evidence, the trial court erred as a matter of law. The statute refers to electors as those who were registered to vote on the date of the public hearing. Section 27--55 contains no further definition of "electors" or "registered voters." However, the General Assembly has decided that the meaning of these terms as used in any statute is supplied by section 3--1.2 of the Election Code (10 ILCS 5/3--1.2 (West 2006)). That provision states:

> "For the purpose of determining eligibility to sign *** a petition proposing a public question the terms 'voter', 'registered voter', *** [and] 'elector', *** as used in this Code or in another Statute shall mean a person who is registered to vote at the address shown opposite his signature on the petition ***." 10 ILCS 5/3--1.2 (West 2006).

Thus, by statute, the total number of "electors" in a designated area such as Special Service Area 23 is the same as the total number of persons registered to vote at addresses in that area. See 10 ILCS 5/3--1.3 (West 2006) ("Whenever this Code or another Statute requires that a *** petition proposing a public question shall be signed by a specified percentage of the registered voters of *** a *** district ***, the total number of voters to which the percentage is applied shall be the number of

voters who are registered in the \*\*\* district \*\*\*").  The village clerk thus properly relied upon the county clerk's list of registered voters in compiling the total number of electors.

Accordingly, the trial court erred in considering the testimony and affidavits regarding persons on the list of registered voters who may have moved out of the special service area, and in adjusting the Village's total downward as a result.  Although the Election Code does permit people who have moved out of the district to be removed from the list of registered voters through the use of affidavits submitted by other registered voters, the affidavits and testimony submitted by the plaintiffs did not comply with the required procedure for such removal.  Instead, under the Election Code, removal may be accomplished only by following a specified procedure, which includes the submission of a particular form of affidavit to the county clerk; notification of the proposed removal mailed by the clerk to the registered voter whose removal is sought, along with a demand to appear at a specified date and time and show cause why the removal should not proceed; and the appearance of the person seeking the removal, before the clerk on that specified date, to show cause why removal is proper. 10 ILCS 5/4--12 (West 2006).  It is readily apparent why these safeguards on removal exist: otherwise, duly registered voters could find themselves removed from the rolls and unable to vote without having received notice or an opportunity for a hearing on the matter, simply on the say-so of their neighbors.

We note that, although section 27--55 also states that the relevant electors are those "residing within the special service area," this residency requirement is itself included in the Election Code's requirements to register to vote in that area.  Thus, by law, anyone who is a registered voter in a given area is also presumed to be a resident of that area, as explained in Shapiro v. Regional Board of School Trustees, 116 Ill. App. 3d 397, 407-08 (1983).  In that case, the plaintiffs filed a petition

to detach a certain area from a school district. The school board dismissed the petition as insufficient, in part because the plaintiffs had not gathered enough signatures of electors, defined in the School Code as registered voters living in the detachment area. The plaintiffs had attempted to decrease the total number of registered voters by conducting a door-to-door survey in the detachment area, asking at each home who resided there and who was a registered voter, and striking the names of people whom the survey takers were told had died or moved. The court rejected this approach, not only because the information gathered was hearsay, but also because the inclusion of a person on the list of registered voters provided proof of residency that the court was bound to accept:

"The problem here is that plaintiffs attempt to read 'registered voter' and 'residing in the detachment area' as two separate and unrelated tests. They then argue that they are only concerned with the latter prong of the test, and assert that the Election Code is inapplicable thereto. *** [P]laintiffs sought to remove names from the official register under the guise of determining who 'resided in' the detachment area. However, that official register tells them who resides in the area, because residency is one of the requirements of registration. If plaintiffs wish to challenge that official registry, they must do so in the manner provided by statute, i.e., section 4--12 of the Election Code [(Ill. Rev. Stat. 1979, ch. 46, par. 4--10 (now see 10 ILCS 5/4--12 (West 2006)))]." Shapiro, 116 Ill. App. 3d at 407-08.

It is undisputed that, in this case, the Objectors did not apply to the county clerk to remove from the list of registered voters those persons whom they believed had moved out of the special service area, and the county clerk did not remove any names from the registered voter list between the public hearings and the Village's adoption of Ordinance No. 07--08--11. Thus, the trial court erred in

deducting from the total number of electors the 62 persons who, according to the plaintiffs' witnesses, had moved.

Inasmuch as the Objectors did not identify anyone the Village counted as an "elector" who was not in fact listed as a registered voter in the special service area, the Village's total of 1,014 electors was the relevant starting point for determining whether the Objectors had obtained the signatures of at least 51% of the total number of electors. The Village conceded that two of the persons listed were dead and should not have been counted in the total. The trial court also found that three electors were listed at addresses that were not within the special service area, and the Village has not contested this finding on appeal. Thus, the total number of electors in the special service area was 1,009. The trial court found that the Objectors had gathered 490 valid signatures (489 recognized as valid by the Village, and 1 that the evidence showed had been incorrectly stricken from the petition). These valid signatures amounted to 48.6% of the total number of electors within the special service area. Accordingly, the Objectors did not meet the 51% threshold with respect to electors.

### Owners of Record

In order to successfully veto the proposed special service area, the Objectors needed to obtain the signatures of both 51% of the electors and 51% of the owners of record, and so their failure to get the required number of electors' signatures means that they cannot prevail in their suit seeking a declaration that Ordinance No. 07--08--11 is void. We acknowledge that the margin of defeat on the number of electors' signatures is narrow, however, and thus we also address the issue of whether the Objectors obtained the necessary number of signatures of owners of record.

In its brief, the Village identified several instances in which, it contended, the trial court erred in its calculations and should not have reduced the total number of owners of record, or should have reduced the number of signatures that it accepted as valid. In reviewing the trial court's determinations, we will not reverse unless they are against the manifest weight of the evidence; that is, unless "the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in evidence." Samour, 224 Ill. 2d at 543. However, on all of the Village's contentions of error relating to owners of record, the plaintiffs' response brief contains no opposition or dispute. Rather, the plaintiffs simply state that they "concur" with the trial court's reasoning. Thus, the plaintiffs have forfeited their opportunity to raise any argument related to these alleged errors. 210 Ill. 2d R. 341(h)(7). Nevertheless, we have conducted our own review of the record as to each specific alleged error, and we find in the Village's favor only where the record confirms the Village's argument.

The trial court took the Village's initial total of 1,240 owners of record as its starting point. We do the same: although the trial court wrongly excluded the Defendants' Exhibits 33 and 34 (which purportedly showed that there were actually 1,263 owners of record), the Village has not argued on appeal that we should use this higher number in our calculations, and thus we begin, as the trial court did, with 1,240 owners of record. The trial court then made the following deductions: 10 properties that were duplicates of other listings according to their property index numbers (PINs); 17 properties that were owned by land trusts, corporations, or living trusts, which properties the Village listed as having more than one owner; and 3 "unknown" properties that the trial court described as lacking both an owner and an address according to the Village's list of owners. The trial court thus found that the total number of owners of record within the special service area was 1,210.

On appeal, the Village challenges two aspects of this calculation. First, as to the three "unknown" properties, the Village contends that the trial court erred in stating that they had no owner of record. There were PINs for these properties, and it is undisputed that they are within the special service area. (In one of their exhibits, the plaintiffs listed these properties as being among the allegedly "unbuildable" properties in the special service area.) The Village also contends that a subdivision plat contained in Exhibit 33 shows the properties as being owned by the subdivider, Peter Niesen. As noted, the plaintiffs did not respond to this argument. Our own review of the record shows that these properties are listed in the Defendants' Exhibits 7 and 23 (which were admitted into evidence) with the owner of record as "Niesen, Peter/Subdivider." The village clerk testified that although the addresses of these properties were unknown, the owner (based on records from the county treasurer's office) was listed. The record establishes that these three properties each had an owner of record and that the trial court erred in reducing the total number of owners by three for these properties.

Second, the trial court subtracted 17 owners on the basis that the Village had improperly counted these properties as having more than one owner, but they were owned by land trusts, corporations, or living trusts. Section 27--55 provides that "[l]and owned in the name of a land trust, corporation, estate or partnership shall be considered to have a single owner of record." 35 ILCS 200/27--55 (West 2006). The trial court held that this language revealed an intent that property owned by institutions rather than individuals could not be counted as having more than one owner regardless of how many joint owners there were. The Village agrees that only one owner should be counted for properties owned by land trusts or corporations. As to living trusts, however, the Village

contends that if more than one living trust owns the property, each co-owner trust should be counted as one "owner of record."

The Village contends that the trial court's ruling and its deductions relating to land held by trusts resulted in errors in the total number of owners of record with regard to two parcels, the Diedrich property (PIN 10--18--102--001) and the property at 2125 Fairview (PIN 09--13--477--028). The Village initially believed, based on the county treasurer's records, that the Diedrich property was owned by a single trust. It therefore counted the property as having only one owner. At trial, however, George Diedrich testified that the trust had conveyed the property to himself and his wife, and the plaintiffs introduced documentary evidence of this conveyance. Accordingly, the evidence showed that the Diedrich property was owned by two individuals, not one trust, and should have been counted as having two owners of record. It appears that the trial court overlooked the testimony regarding the conveyance and that this error affected its ruling regarding the total number of owners of record. We therefore adjust the total number of owners of record upward by one.

The property at 2125 Fairview was co-owned by two living trusts, the Thiessen Trust and the Hurst Trust, and thus should have been counted as having two owners of record. Moreover, the Village asserts that the trial court accidentally compounded its error in deducting one owner of this property, because the Village had inadvertently listed the property as having only one owner to begin with, and thus the trial court's action in deducting one owner meant that no owners were counted for the property.

As to this second point, it is evident from the record that the Village is correct that, as a result of the trial court's ruling, the property at 2125 Fairview was erroneously counted as having no owners. It is uncontested that the property should be listed as having at least one owner. We

therefore add the one owner mistakenly deleted to the total number of owners of record. The Village's first point is also sound. The plaintiffs do not dispute that property owned jointly by more than one individual (such as husbands and wives) should be treated as having more than one owner of record. But, contrary to the trial court's holding, nothing in the plain language of section 27--55 suggests a legislative intent to disqualify multiple owners of the same land from being counted as "owners of record" merely because they are not individuals. The language of a statute is the most reliable indicator of the legislature's objectives in enacting it. Yang v. City of Chicago, 195 Ill. 2d 96, 103 (2001). Section 27--55 states that "[l]and owned in the name of a land trust, corporation, estate or partnership shall be considered to have a single owner of record." (Emphases added.) 35 ILCS 200/27--55 (West 2006). This language prevents a single institutional owner from being counted as if it were more than one owner, as might happen if, e.g., one partnership were counted as if all the partners were "owners of record." However, it does not state that land owned by more than one land trust, corporation, etc., must be treated as having only one owner of record. Thus, the statute does not require that where, as here, more than one living trust owns the property in question, the property nevertheless must be counted as having only one owner.

Moreover, even if the statute did prevent some institutional owners from being counted as owners of record, living trusts are not within the enumerated institutional property owners to which this section applies. 35 ILCS 200/27--55 (West 2006) (the statutory provision applies to land trusts, corporations, estates, and partnerships). Accordingly, there is no statutory mandate requiring that if more than one living trust owns a property, the property must be treated as having only one owner. Ordinarily, all co-owners are counted as "owners of record" of that property. See In re Petition to Annex Certain Real Estate to the City of Joliet, 144 Ill. 2d 284, 291 (1991). In that case, the supreme

court rejected the argument that co-owners of a property should be counted as if they were one owner, and it instead reaffirmed earlier precedent holding that all co-owners of a property should be considered "owners of record." Although the case involved individuals, not trusts, we cannot see any reason to treat trusts owning property differently from individual owners in this context. We therefore find that this property should have been treated as having two owners, not one, and we therefore add an owner to the total number of owners of record.

Taking into account the three owners of record improperly deducted for the "unknown" properties, the two owners improperly counted as one for the Diedrich property, and the two owners improperly deducted for 2125 Fairview, we find that the total number of owners of record was 1,216. The Objectors thus needed at least 620 valid signatures to veto the proposed special service area (51% of 1,216). The trial court found that the Objectors had obtained 619 valid signatures. In addition, the Village argues (and its argument is supported by the record) that the trial court erred in counting as valid the signature of Jean Schulien for the property at 2406 West Johnsburg Road, because that property was owned by a living trust for which her husband was the trustee; Jean Schulien testified that she was the beneficiary, not the trustee, of this trust. Thus, even accepting the trial court's premise that an individual could sign on behalf of the living trust that owned the property if that person was the trustee (even if the person did not so indicate on the petition), Jean Schulien's signature on behalf of her husband's trust was invalid. Once again, the plaintiffs have not submitted any evidence or argument to the contrary. We therefore find that there were at most 618 valid signatures of owners of record, or less than the 51% necessary to veto the proposed special service area. In summary, we find that the Objectors did not obtain the signatures of 51% of either the

electors or the owners of record, and that Ordinance No. 07--08--11 therefore is not void and the plaintiffs are not entitled to injunctive relief.

The Village raises other arguments as well in support of its bid to reverse the trial court. For instance, the Village argues passionately that the trial court erred in accepting testimony regarding properties that were owned by trusts (other than land trusts), for which the Objectors obtained signatures that did not reflect that the signatories were signing as trustees of the particular trusts that owned the properties. The Village originally disqualified approximately 47 of these signatures, but the trial court ultimately held that it should not have done so and counted most of those signatures as valid. However, regardless of whether these signatures are counted, the Objectors did not obtain sufficient signatures to meet the statutory thresholds, as a result of the errors we identified above. Accordingly, we express no opinion as to the validity of the signatures of individuals who signed for the trusts owning the properties.

For all of the foregoing reasons, the judgment of the circuit court of McHenry County is reversed.

Reversed.

O'MALLEY and BURKE, JJ., concur.